# United States District Court
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

|  |  |  |
|---|---|---|
| HEALTHTRACKRX INDIANA, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 4:23-cv-1063 |
| v. | § | Judge Mazzant |
| | § | |
| RSUI INDEMNITY COMPANY, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM ADOPTING IN PART THE REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Came on for consideration the Report and Recommendation ("Report") of the United States Magistrate Judge in this action, this matter having been heretofore referred to the Magistrate Judge under 28 U.S.C. § 636. The instant controversy stems from cross motions for judgment on the pleadings (Dkt. #14; Dkt. #15; Dkt. #21). On March 7, 2025, the Magistrate Judge entered a Report (Dkt. #21). Through it, the Magistrate Judge recommended that Defendant's Motion for Judgment on the Pleadings (Dkt. #14) be granted in part and denied in part. The Report also recommends that Plaintiff's Motion for Judgment on the Pleadings (Dkt. #15) be denied. After conducting a *de novo* review, and having considered the parties' objections, the relevant pleadings, and the applicable law, the Court concludes that the Report should be **ADOPTED in part**. Defendant's Motion for Judgment on the Pleadings (Dkt. #14) should be **GRANTED in part** and **DENIED in part**. Plaintiff's Motion for Judgment on the Pleadings (Dkt. #15) should be **DENIED**. Part III.C. of the Report should be **RETURNED** for further consideration.

## BACKGROUND

### I.    Factual Background

This is an insurance coverage dispute. Plaintiff HealthTrackRX Indiana, Inc. is a provider of infectious-disease laboratory testing subject to significant regulatory oversight (Dkt. #1 at p. 3). Plaintiff's parent company is PL Parent, LLC ("PL Parent") (Dkt. #1 at p. 4). PL Parent purchased an insurance policy (the "Policy") from Defendant RSUI Indemnity Company (Dkt. #1 at p. 4). The Policy contemplates a one-year coverage period of July 19, 2022, to July 19, 2023 (Dkt. #1 at p. 4). The Policy provides certain coverage for regulatory claims.

During 2023, Plaintiff received two regulatory claims (Dkt. #1 at p. 3). First, around January 27, 2023, Plaintiff received a regulatory claim which sought production of sixteen types of Plaintiff's documents and propounded upon Plaintiff twenty-five interrogatories (Dkt. #1 at p. 4). Second, around July 5, 2023, Plaintiff received another regulatory claim which sought the production of ten types of Plaintiff's documents and propounded upon Plaintiff eleven interrogatories (Dkt. #1 at p. 4). When Plaintiff notified Defendant of the regulatory claims, Defendant agreed to defend Plaintiff against those claims and consented to Plaintiff's selection of defense counsel (Dkt. #21 at p. 1). However, Defendant communicated to Plaintiff that the costs of defending Plaintiff were subject to: (1) a $250,000 "retention" that Plaintiff would have to pay before coverage under the Policy would be triggered, and (2) a $250,000 limit on liability coverage (Dkt. #21 at p. 1). Plaintiff disputes the applicability of both conditions. This litigation followed.

### II.    The Relevant Policy Language

Because the resolution of the instant dispute turns almost exclusively on the language of the Policy at issue, the Court deems it appropriate to summarize the Policy provisions at play. "The parties have stipulated on a true, correct, and complete copy of the Policy," which

Defendant submitted alongside its Motion for Judgment on the Pleadings (Dkt. #14-1). Section V.P. of the Policy includes a choice-of-law provision (Dkt. #14-1 at p. 24). The parties do not object to the Report's interpretation of that provision as an enforceable one that, in this case, requires that the Policy be interpreted under Indiana law (Dkt. #21 at p. 3; Dkt. #22; Dkt. #23).

The parties also agree on the provisions at issue. Though dense, there are only a few. Starting at the top, the Policy's declarations include three types of coverage sections, which simply denote the general contours of the insured's coverage (Dkt. #14-1 at pp. 2, 19; Dkt. #21 at p. 3). They are: (1) Directors and Officers Liability Insurance; (2) Employment Practices Liability Insurance; and (3) Fiduciary Liability Insurance (Dkt. #14-1 at p. 2; Dkt. #21 at p. 3). Only the Directors and Officers Liability Insurance Coverage Section is at issue here (Dkt. #21 at p. 4).

Next, as to the general terms of the Policy, the Report observes that it includes a "Common Policy Terms and Conditions Coverage Section," which defines terms most frequently used in the Policy (Dkt. #14-1 at p. 18; Dkt. #21 at p. 4). Sub-section I. of that Section states:

Section I. – Common Policy Terms and Conditions

The Common Policy Terms and Conditions Section of this Policy shall apply to all **Coverage Sections**. Unless stated to the contrary in any **Coverage Section**, the terms and conditions of each **Coverage Section** of this policy shall apply only to that **Coverage Section** and shall not apply to any other **Coverage Section** of this policy. If any provision in the Common Policy Terms and Conditions sections is inconsistent or in conflict with the terms and conditions in any **Coverage Section**, including any endorsements attached thereto, the terms and conditions of such **Coverage Section** or endorsement, shall supersede for the purposes of that **Coverage Section**.

(Dkt. #14-1 at p. 18).[1] This Common Policy Terms and Conditions Coverage Section defines, as the Report observes, a "critical term" at the heart of this dispute: **Loss** (Dkt. #14-1 at p. 19; Dkt. #21 at p. 4).

Turning to the narrower provision at issue, the Directors and Officers Liability Coverage Section contemplates three different Insuring Agreements (Dkt. #14-1 at p. 43). The parties agree that the only Agreement at issue here is the third (labeled as "C"), which states, in relevant part:

> If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions, and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:
>
> . . .
>
> With the **Insured Organization**, that if a **Claim** or **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

(Dkt. #14-1 at p. 43).

The terms used above take on special meanings, as defined by both the COMMON POLICY TERMS AND CONDITIONS COVERAGE SECTION and the Directors and Officers Liability Insurance Coverage Section (Dkt. #14-1 at pp. 19, 44). The Common Policy Terms and Conditions Section does not concretely define **Loss**. Instead, it states that "**Loss** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy" (Dkt. #14-1 at p. 19) (cleaned up). In turn, the Directors and Officers Liability

---

[1] Terms that appear in bold indicate that the term appears as such and is defined in the Policy and is used in this Order in accordance with those definitions.

Insurance Coverage Section defines **Loss** as "damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**" (Dkt. #14-1 at p. 44).

As the Report notes, while the Directors and Officers Liability Insurance Coverage Section does not define **Defense Expenses** as used in that Section's definition of **Loss**, the Common Policy Terms and Conditions Section does (*See* Dkt. #14-1 at pp. 44–45). The Common Policy Terms and Conditions Section defines **Defense Expenses** as follows:

> **Defense Expenses** means reasonable and necessary legal fees and expenses incurred, with the **Insurer's** consent, by any **Insured** in defense of a **Claim**, including any appeal therefrom. **Defense Expenses**, however, shall not include:
>
> 1. Remuneration, overhead or benefit expenses associated with any **Insured Person**; or
>
> 2. Any obligation to apply for or furnish any appellate or similar bond.

(Dkt. #14-1 at p. 19).

Turning back to the Directors and Officers Liability Insurance Coverage Section—and recalling that the Policy's endorsements impact the meaning of particular Policy terms—the Policy includes a "Texas – Regulatory Coverage" Endorsement (Dkt. #14-1 at pp. 53–54). That Endorsement defines additional important terms: (1) "Regulatory Claim"; (2) "Regulatory Wrongful Act"; and (3) "Retaliation" (Dkt. #14-1 at pp. 53–54). Critically, it defines **Loss** for purposes of the Directors and Officers Liability Coverage Section to mean the following:

> C.    Solely with respect to the coverage afforded by this endorsement, the term **Loss**, as defined in SECTION III. – DEFINITIONS of the Directors and Officers Liability Coverage Section, is amended to include the amount that any **Insured** shall become legally obligated to pay on account of any covered **Regulatory Claim**, including but not limited to:
>
> (a) damages;
>
> (b) judgments;

5

(c) settlements; and

(d) pre-judgment and post-judgment interest.

D.     Solely with respect to coverage afforded by this endorsement, the term **Loss,** as defined in SECTION III. – DEFINITIONS of the Directors and Officers Liability Section shall not include:

(a) any bond or surety requirement;

(b) any amount of overpayment or restitution that is identified as such in any document or instrument effecting any settlement;

(c) fees, profits, or other revenue lost, or any costs incurred, by an **Insured** in connection with the termination, suspension, or limitation of such **Insured's** right to participate in any program of a federal, state or local governmental, regulatory or administrative agency or entity; or

(d) the cost of any compliance program, or the cost of complying with any integrity agreement made as part of, or in anticipation of expectation of, or otherwise in connection with any such settlement.

(Dkt. #14-1 at p. 54). The Texas – Regulatory Coverage Endorsement concludes, "[a]ll other terms and conditions of this policy remain unchanged" (Dkt. #14-1 at p. 54).

The "meat and potatoes" of the Endorsement concerns the Policy coverage Plaintiff has against **Regulatory Claims** (*See* Dkt. #14-1 at p. 54). It states, in relevant part, that:

The **Insurer** will pay on behalf of the **Insured** any **Loss** from a **Regulatory Claim** first made against them during the **Policy Period** and reported in accordance with Section V. - Conditions, C. Notice of Claim or Circumstance of the Common Policy Conditions Coverage Section, which shall be applicable to **Regulatory Claims** as it is for **Claims** generally. The **Insurer's** maximum aggregate Limit of Liability for **Loss** under this policy in connection with **Regulatory Claims** made against all **Insured's** shall be <u>$250,000</u>. This sublimit shall be part of and not in addition to the amount set forth in Item 2.A of the Directors and Officers Liability Declarations Page.

A Retention in the amount of <u>$250,000</u> shall apply to any **Loss** arising from a **Regulatory Claim**. Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Loss** arising from a **Regulatory Claim** which is in excess of the above stated Retention amount.

(Dkt. #14-1 at p. 54). Distilled down to its most basic form, the parties' dueling interpretations of these provisions give rise to three discrete questions which occupy the Court's attention:

1.  Whether the Policy's definition of **Loss** includes **Defense Expenses** incurred by defending Plaintiff against **Regulatory Claims** (Dkt. #21 at pp. 5–9);

2.  Whether Plaintiff's **Defense Expenses** under the Policy are subject to a $250,000 retention (Dkt. #21 at pp. 9–11); and

3.  Whether **Defense Expenses** incurred in defending Plaintiff against **Regulatory Claims** count against the Policy's $250,000 limit on liability coverage (Dkt. #21 at pp. 11–14).

All this in mind, the Court next summarizes the relevant procedural history.

## III.    Procedural Background

Because Plaintiff and Defendant disagree about the extent of coverage that Plaintiff is entitled to under the Policy, Plaintiff filed suit (Dkt. #1). Its Complaint asserts causes of action for breach of contract and breach of the covenant of good faith and fair dealing (Dkt. #1 at p. 7). Plaintiff also seeks a declaration that the Policy requires Defendant to defend Plaintiff against regulatory claims "not subject to the retention and without eroding policy limits" (Dkt. #1 at p. 7).

The parties agreed to conduct this litigation in two phases, the first of which concerns Plaintiff's claim for declaratory relief, the second of which concerns Plaintiff's claims for breach of contract and breach of the covenant of good faith and fair dealing (Dkt. #10 at p. 2). As to the declaratory action at issue in the first phase, the parties agree that the question of the Policy's interpretation should be resolved via judgment on the pleadings (Dkt. #10 at p. 2). The second phase of litigation will resolve Plaintiff's remaining claims (Dkt. #10 at p. 2).

Pursuant to the dual-phase scheduling agreement, both parties filed their respective Motions for Judgment on the Pleadings (Dkt. #14; Dkt. #15). The Magistrate Judge then entered

his Report on March 7, 2025 (Dkt. #21). As the Report explains, with respect to each question posed above, the Magistrate Judge concluded:

1. The Policy's definition of **Loss** includes **Defense Expenses** incurred by defending Plaintiff against **Regulatory Claims** (Dkt. #21 at pp. 5–9).

2. The Policy does not entitle Plaintiff to "first-dollar" coverage of **Defense Expenses**. Instead, Plaintiff's coverage of **Defense Expenses** under the Policy are subject to a $250,000 retention (Dkt. #21 at pp. 9–11).

3. The record lacked sufficient information to conclude as a matter of law whether **Defense Expenses** incurred by defending Plaintiff against **Regulatory Claims** count against the Policy's $250,000 limit on liability coverage (Dkt. #21 at pp. 11–14).

Accordingly, the Report recommends that the Court grant Defendant's Motion for Judgment on the Pleadings (Dkt. #14) insofar as Defendant is "entitled to a declaration that the [P]olicy provides coverage for defense expenses incurred as a result of regulatory claims subject to a $250,000 retention amount" (Dkt. #21 at p. 13). Conversely, the Report recommends that the Court deny Defendant's Motion for Judgment on the Pleadings insofar as Defendant "is not entitled to a declaration regarding whether those expenses count toward the $250,000 liability limit" (Dkt. #21 at pp. 13–14). Because the Report recommends that the Court grant in part and deny in part Defendant's Motion for Judgment on the Pleadings, the Report recommends that the Court deny in full Plaintiff's Motion for Judgment on the Pleadings (Dkt. #21 at p. 14).

On March 21, 2025, both parties submitted specific objections to the Report, which amount to a complete disagreement with each of the Magistrate Judge's conclusions (Dkt. #22; Dkt. #23). Plaintiff advances two objections to the Report: (1) that the Magistrate Judge erred in concluding that the policy's definition of **Loss** includes **Defense Expenses** for **Regulatory Claims** that are

subject to a $250,000 retention; and (2) that the Magistrate Judge erred in concluding that the record lacked sufficient information to conclude whether **Defense Expenses** incurred in defending Plaintiff against **Regulatory Claims** count against the Policy's $250,000 retention (Dkt. #23 at pp. 3–7). For its part, Defendant objects to only one portion of the Report (Part III.C.) and argues that **Defense Expenses** incurred in the face of **Regulatory Claims** are subject to the Policy's $250,000 limit on liability (Dkt. #22). On April 4, 2025, Defendant filed a Response to Plaintiff's Objections, which defends portions of the Report and further advances its own Objection (Dkt. #24). The Court now performs a *de novo* review. *See* 28 U.S.C. § 636(b).

## LEGAL STANDARD

A party who files timely written objections to a magistrate judge's report and recommendation is entitled to a *de novo* review of those findings or recommendations to which the party specifically objects. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2)–(3). Having received timely and specific written objections to the Magistrate Judge's Report, the Court now performs its *de novo* review. *See* 28 U.S.C. § 636(b).

As mentioned, the matter before the Court comes by way of objections to a Report issuing a recommendation on cross motions for judgment on the pleadings. Thus, the Court recalls, as the Report explains, the standard by which courts decide such motions. Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not the delay trial—a party may move for judgment on the pleadings." "A motion brought pursuant to Rule 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co., Inc. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (citation

omitted) (cleaned up); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312–13 (5th Cir. 2002). "The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Hughes v. Tobacco Inst., Inc.,* 278 F.3d 417, 420 (5th Cir. 2001) (citing *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 440 n.8 (5th Cir. 2000)).

"Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of fact and only questions of law remain." *Great Plains Tr.*, 313 F.3d at 312 (quoting *Hughes*, 278 F.3d at 420). The standard applied under Rule 12(c) is the same as that applied under Rule 12(b)(6). *Ackerson v. Bean Dredging, LLC*, 589 F.3d 196, 209 (5th Cir. 2009); *Guidry v. Am. Pub. Life Ins. Co.,* 512 F.3d 177, 180 (5th Cir. 2007).

## ANALYSIS

The Court starts with the threshold question of what law applies to this insurance coverage dispute. The Magistrate Judge answered, Indiana law (Dkt. #21 at p. 3). Neither party objects to that conclusion, nor to the Magistrate Judge's reasoning in support thereof (Dkt. #22; Dkt. #23). Absent a specific, written objection to the Report's conclusion, and seeing no error in the Magistrate Judge's choice-of-law analysis, the Court concludes that Indiana law applies to construction of the Policy in dispute. The Court therefore adopts that portion of the Report in full and incorporates it here by reference (Dkt. #21 at p. 3).

### I.    Plaintiff's Objection to Policy Coverage

Having adopted the Report's conclusion that Indiana law governs the Court's interpretation of the Policy, the Court turns to the objections before it, starting with Plaintiff's objection to the Report's conclusion that Plaintiff's coverage for **Defense Expenses** under the Policy are subject to a $250,000 retention (Dkt. #23 at pp. 3–7). The narrow issue here, as Plaintiff

frames it, is "whether the amended definition of **Loss** specific in the endorsement specially for regulatory claims is 'first dollar' (not subject to retention) and 'outside of limits' (does not erode the indemnity coverage limit)" (Dkt. #23 at p. 3). Defendant does not dispute that framing, though it obviously contends that the coverage is subject to retention and "erodes the indemnity coverage limit" (Dkt. #14 at p. 7). The Report breaks this analysis into two buckets and addresses each in turn. First, the Report contemplates whether the definition of "**Loss** includes defense expenses for regulatory claims" (Dkt. #21 at p. 5) (cleaned up). According to the Report, it does. (Dkt. #21 at p. 5). Second, the Report analyzes whether "[c]overage for **Defense Expenses** incurred as a result of regulatory claims is subject to the $250,000 retention amount" (Dkt. #21 at p. 9) (cleaned up). Again, according to the Report, it is (Dkt. #21 at p. 11). Defendant, having persuaded the Magistrate Judge of its position, does not object to these conclusions (*See* Dkt. #22). The Court deems the Report's two-step framework appropriate. Accordingly, the Court's analysis also proceeds in two steps.

### A.    Whether "Loss" Includes "Defense Expenses" for Regulatory Claims

The Court begins where the Magistrate Judge did. That is, with the question of whether the term **Loss** as used in the Regulatory Endorsement includes **Defense Expenses** (Dkt. #21 at p. 5). The Report answers the question in the affirmative (Dkt. #21 at pp. 5–9). In asking the same question *de novo*, the Court looks first to the Report to set the scene. Then, the Court will ventilate the arguments Plaintiff raises against the Report before ultimately coming to a decision *de novo*.

In reaching his conclusion, the Magistrate Judge recalled fundamental principles of insurance contract interpretation with which the Court agrees (Dkt. #21 at p. 6). As the Report notes, "[u]nder Indiana law, 'an insurance policy is a contract like any other' and is 'governed by the same rules of construction as other contracts" (Dkt. #21 at p. 6) (quoting *Justice v. Am. Fam.*

*Mut. Ins. Co.*, 4 N.E.3d 1171, 1175–76 (Ind. 2014)). "'When confronted with a dispute over the meaning of insurance policy terms,' courts applying Indiana law 'afford clear and unambiguous policy language its plain, ordinary meaning'" (Dkt. #21 at p. 6) (quoting *Erie Indem. Co. v. Est. of Harris*, 99 N.E.3d 625, 630 (Ind. 2018)). As the Report properly observes, when a court interprets an insurance policy, the Court's aim is to "'harmonize its provisions, rather than place the provisions in conflict'" (Dkt. #21 at p. 6) (quoting *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 247 (Ind. 2005)).

As to special principles governing insurance policy construction in Indiana, the Magistrate Judge also explained that "ambiguities in insurance policies are construed in favor of insureds." (Dkt. #21 at p. 6) (citing *G&G Oil Co. of Ind. v. Cont'l W. Ins. Co.*, 165 N.E.3d 82, 87 (Ind. 2021)). As the Report states, policy language is ambiguous only when "'reasonably intelligent policyholders would honestly disagree on the policy's language meaning'" (Dkt. #21 at p. 6) (quoting *Erie Indem. Co.*, 99 N.E.3d at 630). Absent a legitimate ambiguity, the Court must enforce the policy "'according to its terms, even those terms that limit an insurer's liability'" (Dkt. #21 at p. 6) (quoting *Haag v. Castro*, 959 N.E.2d 819, 824 (Ind. 2012)).

With these principles in mind, the Magistrate Judge returned to the Policy's text. The Report quotes the precise language of the Texas – Regulatory Coverage Endorsement (Dkt. #21 at p. 7). Upon a plain reading of that language, the Report notes that the regulatory Endorsement *amends* the Directors and Officers Liability Coverage Section's definition of **Loss**, which includes **Defense Expenses** (Dkt. #21 at p. 7). The Report rejects outright Plaintiff's original argument that "amendments to definitions in policies generally supersede definitions" after due consideration (Dkt. #21 at p. 8). It did so for two reasons. First, the only authority Plaintiff cited in support of

that argument is not Indiana law; it was a case decided "by a Texas court under Texas law" (Dkt. #21 at p. 8). Second, Plaintiff's preferred rule of construction is triggered only where the policy and its endorsements are "so much in conflict they cannot be reconciled" (Dkt. #21 at p. 8) (citing *TIG Ins. Co. v. N. Am. Van Lines, Inc.*, 170 S.W.3d 264, 271 (Tex. App.—Dallas 2005, no pet.)). Detecting no conflict, the Magistrate Judge dismissed that argument (Dkt. #21 at p. 8).

Returning again to the language of the Texas – Regulatory Coverage Endorsement, the Magistrate Judge noted that "[t]he regulatory endorsement expands coverage by adding that losses are covered if 'any **Insured** shall become legally obligated to pay [them] on account of any covered **Regulatory Claim**,' a type of claim not included in the [Directors and Officers Liability] Coverage [S]ection" (Dkt. #21 at p. 9) (citing Dkt. #14-1 at pp. 44, 54). Critically, the Report notes that while the Texas – Regulatory Coverage Endorsement "identifies four types of covered losses that are also included in the [Directors and Officers Liability] [C]overage [S]ection, it explicitly states that covered losses are 'including but not limited to' those enumerated types" (Dkt. #21 at p. 9).

The Report also grappled with Plaintiff's second original argument in favor of its interpretation of the Policy—that the Endorsement is, at least, ambiguous, meaning that it should be construed against the drafter (in favor of Plaintiff, the insured) (Dkt. #21 at p. 9). The Report concludes that Plaintiff's interpretation of the Texas – Regulatory Coverage Endorsement that excludes **Defense Costs** from **Loss** is not reasonable because it is "contrary to the plain meaning" of the Endorsement's text (Dkt. #21 at p. 9). Therefore, the Magistrate Judge found against Plaintiff on this point.

Plaintiff's objections do not appear to dispute the existence or legitimacy of the principles of Indiana contract law the Report chronicles (*See* Dkt. #23). Rightly so, because these principles

are well established under Indiana law. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Jakubowicz*, 56 N.E.3d 617, 619 (Ind. 2016) (quoting *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005) ("an insurance policy is a contract, and as such is subject to the same rules of construction as other contracts."); *City of Jasper, Ind. v. Employers Ins. of Wausau*, 987 F.2d 453, 456 (7th Cir. 1993) (citing *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992) ("Under Indiana law, courts will give plain and unambiguous language in an insurance policy its ordinary meaning."); *Circle Block Partners, LLC v. Fireman's Fund Ins. Co.*, 44 F.4th 1014, 1018 (7th Cir. 2022) (quoting *Pelliccia v. Anthem Ins. Cos.*, 90 N.E.3d 1226, 1231 (Ind. Ct. App. 2018) (stating that, under Indiana law, "[a] reviewing court must construe the [insurance] policy as a whole and aim to 'harmonize the policy's provisions rather than place them in conflict."); *id.* (citing *Ebert v. Illinois Casualty Co.*, 188 N.E.3d 858, 863–64 (Ind. 2022) ("Where a provision is ambiguous . . . it is construed in favor of the insured."); *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 242 (Ind. 2000) (same); *Allgood*, 836 N.E.2d at 246 –47 (citing *Burkett v. Am. Fam. Ins. Grp.*, 737 N.E.2d 447, 452 (Ind. Ct. App. 2000) (noting that, under Indiana law, "if reasonably intelligent persons may honestly differ as to the meaning of the policy language, the policy is ambiguous"); *Sheehan Const. Co., Inc. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 169 (Ind. 2010), *opinion adhered to as modified on reh'g*, 938 N.E.2d 685 (Ind. 2010) (citing *Ramirez v. Am. Fam. Mut. Ins. Co.*, 652 N.E.2d 511, 514 (Ind. Ct. App. 1995) ("An insurance policy that is unambiguous must be enforced according to its terms, even those terms that limit an insurer's liability.").

Instead, Plaintiff's objections urge that the Report did not properly apply these principles (Dkt. #23 at p. 4). Plaintiff also focuses on other additional Indiana principles of insurance policy construction and urges that the Report ignores them (Dkt. #23 at p. 4). To Plaintiff, the

Texas – Regulatory Coverage Endorsement's omission of **Defense Expenses** can yield only one reasonable interpretation: that **Defense Expenses** are not included in the Endorsement's definition of **Loss** such that **Defense Expenses** are subject to any retention (*See* Dkt. #23 at p. 2). Plaintiff suggests that its interpretation is the most—if not the only—reasonable interpretation (Dkt. #23 at p. 2). Much of this is simply a regurgitation of Plaintiff's arguments raised before the Magistrate Judge via its original Motion for Judgment on the Pleadings (*Compare* Dkt. #15, *with* Dkt. #23). No less, the Court attempts to discern specific points of error Plaintiff raises and performs a *de novo* review of the Policy's construction.

Plaintiff concedes that the Magistrate Judge is "correct" that the Texas – Regulatory Coverage Endorsement uses the words "amended" and "including but not limited to," but contends that this verbiage is not dispositive because hyper-fixation on these terms ignores "critical context" (Dkt. #23 at p. 4). Specifically, Plaintiff points to the Endorsement's language and the language used to define **Loss** in the Common Policy Terms and Conditions Section (Dkt. #23 at p. 4). To Plaintiff, the only difference in the two definitions sections is that, in the Endorsement, **Defense Expenses** are not included in the definition of **Loss** (Dkt. #23 at pp. 4–5). Accordingly, Plaintiff argues that that omission necessarily means that **Defense Expenses** are not expressly included in the Endorsement's definition of **Loss** (Dkt. #23 at p. 5). Any other interpretation, according to Plaintiff, renders the Section superfluous (Dkt. #23 at p. 5). Then, Plaintiff contends that its interpretation is reasonable, particularly given the fact that under Indiana law, "'[p]rovisions granting coverage . . . ***must*** be read broadly in favor of coverage'" and "'limiting principles must be read narrowly'" (Dkt. #23 at p. 5) (quoting *Liberty Mut. Fire Ins. Co.*

*v. Beatty*, 870 N.E.2d 546, 551 (Ind. Ct. App. 2007) and citing *Aetna Cas. & Sur. Co. v. Crafton*, 551 N.E.2d 893, 895 (Ind. Ct. App. 1990)) (emphasis in original).

Plaintiff's arguments are misguided. Plaintiff cannot fabricate an ambiguity where there is none, call it reasonable, and expect the Court to rule in its favor despite plain language to the contrary. *See Erie Indem. Co.*, 99 N.E.3d at 630. As the Report correctly observes, Plaintiff's "proposed reading of the [P]olicy is contrary to the plain meaning of its text and is therefore not reasonable" (Dkt. #21 at p. 9) (citing *id.*). The Court agrees, and Plaintiff presents no compelling reason for the Court to deviate from the Policy's plain text. The Magistrate Judge's reading of the Policy does not seem to render anything impermissible surplusage. Finally, the interpretative principles that Plaintiff urges the Magistrate Judge misapplied do not change the result. Those principles do not give the Court a roving license to ignore the plain text of the Policy. They cannot change the meaning of unambiguous text. *O'Bryant v. Adams*, 123 N.E.3d 689, 693 (Ind. 2019) ("[C]ourts need not resort to interpretive canons at all when a word or phrase is unambiguous. In such circumstances, we simply apply the text's plain meaning."). The Court therefore declines Plaintiff's invitation to look past Policy's plain text.

Plaintiff's next "objection" is nothing of the sort. Plaintiff claims that, if the Court adopts the Report, it will "move for reconsideration and leave to amend, since new information obtained after the close of briefing further proves [Plaintiff's] position" (Dkt. #23 at p. 6) (cleaned up). Specifically, Plaintiff asserts that, during discovery, it "obtained an alternative form used by [Defendant] for the Regulatory Coverage [E]ndorsement" (Dkt. #23 at p. 6). That form "specifically lists **Defense Expenses** as one of the categories of payments that qualify as **Loss** subject to the retention and eroding limits" (Dkt. #23 at p. 6).

16

That argument is of no weight here for two reasons, one of which is procedural, the other of which is substantive. As to the former, a party cannot raise a new issue for the first time in an objection to the Magistrate Judge's Report. *Finley v. Johnson*, 243 F.3d 215, 218 n.3 (5th Cir. 2001) (citing *United States v. Armstrong*, 951 F.2d 626, 630 (5th Cir. 1992) ("[The Fifth Circuit] has held that issues raised for the first time in objections to the report of a magistrate judge are not properly before the district judge.")). As to the latter, Plaintiff's argument is not persuasive. Of course, Plaintiff may file any motion it deems fit. But Plaintiff's argument based on extrinsic evidence, as raised here, invites an inappropriate inquiry. "If the language of an insurance policy is unambiguous, a court may not consider extrinsic evidence to cast doubt on its meaning." *Glander v. Mut. of Omaha Ins. Co.*, 347 F. Supp. 2d 604, 612 (N.D. Ind. 2004) (citing *RMJ Enter., Inc. v. Scottsdale Ins. Co.*, 808 N.E.2d 159, 163 (Ind. Ct. App. 2004)); *Bd. of Com'rs of Del. Cnty. v. Evans*, 979 N.E.2d 1042, 1046 (Ind. Ct. App. 2012) ("We will determine the intent of the contracting parties by analyzing the contractual language within the four corners of the document. If that language is unambiguous, we may not look to extrinsic evidence to expand, vary, or explain the instrument.") (internal quotation omitted); *Allstate Ins. Co. v. Burns*, 837 N.E.2d 645, 651 (Ind. Ct. App. 2005) ("When the terms of the contract are clear and unambiguous, those terms are conclusive, and this court will not construe the contract or consider extrinsic evidence."). Plaintiff's argument—again—assumes that the Policy is ambiguous on this question. It is not. Hence, the Report so concluded. That decision was correct then. It is equally correct today. Plaintiff's objections on this point are thus overruled.

**B.    Whether Coverage for "Defense Expenses" Due to "Regulatory Claims" is Subject to a $250,000 Retention Amount**

Next, the Report concludes that the Policy's coverage of **Defense Expenses** that may be incurred due to defending Plaintiff against a **Regulatory Claim** is subject to a $250,000 retention (Dkt. #21 at pp. 9–11). Plaintiff does not seem to raise a separate objection to this narrow conclusion. Though, on a broad level, Plaintiff disputes that **Defense Expenses** could ever be subject to a retention because they are not defined as **Loss** under the Directors and Officers Liability Coverage Section (*See* Dkt. #23 at pp. 1–7). The Court has already concluded that Plaintiff's position with respect to the word **Loss** is not grounded in the text of the Policy and applicable Indiana law. Therefore, the Court has overruled Plaintiff's objections to the contrary. *See supra*, I.A. Though Plaintiff has not raised a *specific* objection to this section of the Report, the Court can discern that Plaintiff takes some issue with the Report's analysis insofar as Plaintiff claims that it ignores that an insurer's duty to defend is broader than the Policy, and therefore not subject to retention (*See* Dkt. #23 at p. 2). In the interest of completeness and for the benefit of finality, the Court will conduct a *de novo* review of this section of the Report as well. But it does not change the outcome.

The Court agrees with the Report's conclusion that **Defense Expenses**, as included in the definition of **Loss** under the Texas – Regulatory Coverage Endorsement, are subject to a $250,000 retention for the reasons set forth in the Report (*See* Dkt. #21 at pp. 9–11). It bears repeating, under Indiana law, "an insurance policy is a contract like any other" and is "governed by the same rules of construction as other contracts." *Justice*, 4 N.E.3d at 1175–76. The first cardinal rule of contract interpretation is that unambiguous contract language will be enforced, "according to its terms, even those terms that limit an insurer's liability." *Haag*, 959 N.E.2d at 824.

18

In answering this retention question, the Report began, again, with the Policy's text. Condition V.B.3 of the Common Policy Terms and Conditions Coverage Section establishes the basics of retention under the Policy (*See* Dkt. #14-1 at p. 21). It states:

> As a condition precedent to coverage under this policy, the **Insured** shall pay with respect to each **Claim** the applicable Retention amount, as identified in Item 3. of the Declarations Page for each applicable **Coverage Section** or as otherwise identified. The Retention amount shall be reduced solely by covered **Loss** and shall be applied to all **Loss**, including **Defense Expenses**, and the **Insurer** shall only be liable for the amount of **Loss** that is in excess of the stated Retention amount.

(Dkt. #14-1 at p. 21). Item 3 of the Declarations for the Directors and Officers Liability Coverage Section lists specific retention amounts for each of the Insuring Agreements (*See* Dkt. #14-1 at p. 3). Insuring Agreement C applies here. For Insuring Agreement C, the specified retention amount is $250,000 (Dkt. #14-1 at p. 3). As the Report observes, the Directors and Officers Liability Coverage Section explains the scope of the Insuring Agreement, and the Texas – Regulatory Coverage Endorsement "add[s] to" that Section that:

> A Retention in the amount of $250,000 shall apply to any **Loss** arising from a **Regulatory Claim**. Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Loss** arising from a **Regulatory Claim** which is in excess of the above stated Retention amount.

(Dkt. #14-1 at p. 53).

According to Plaintiff's Motion for Judgment on the Pleadings before the Magistrate Judge, and as alluded to in its Objections to the Report, **Defense Costs** related to **Regulatory Claims** is "first dollar," i.e., not subject to a retention amount (Dkt. #15 at pp. 14–16; Dkt. #23 at pp. 1–2). Plaintiff advances this interpretation for two reasons. First, Plaintiff claims that **Loss** excludes **Defense Expenses** as contemplated by the Texas – Regulatory Coverage Endorsement (Dkt. #15 at pp. 14–16; Dkt. #23 at pp. 1–2). Second, Plaintiff argues that Defendant's duty to defend Plaintiff is broader than Defendant's duty to indemnify (Dkt. #15 at pp. 14–16; Dkt. #23 at pp. 1–2). The

Report rejected that argument, relying once more on the Policy's plain language. In articulating its contrary position, Plaintiff relies on the "Duty to Defend" provision of the Common Policy Terms and Conditions Section (Dkt. #14-1 at p. 20). But that language is irrelevant here because, as the Magistrate Judge noted, the "Amended Settlement Provision"—another endorsement in the Policy—"delete[s] and replace[s]" that duty to defend language (Dkt. #14-1 at p. 29). In pertinent part, that Endorsement states that:

> [i]t shall be the right and the duty of the **Insurer** to defend any **Claim** against any **Insured** for which coverage applies under this policy, and the **Insurer** shall have the right to appoint counsel of its choosing. No **Insured** may incur any **Defense Expenses**, admit liability for or settle any **Claim** or negotiate any settlement without the **Insurer's** prior written consent; such consent not to be unreasonably withheld.

(Dkt. #14-1 at p. 29). Nothing in that language suggests that **Defense Expenses** are not subject to retention. In fact, other portions of the Policy—namely, the Texas – Regulatory Coverage Endorsement—suggest that **Defense Expenses,** as included in that Endorsement's definition of **Loss,** are subject to retention (*See* Dkt. #14-1 at p. 53). The Amended Settlement Provision does not appear to be in conflict with the Texas – Regulatory Coverage Endorsement.

The Report observed that "nothing in the [P]olicy supports [Plaintiff's] position that retention applies only to [Defendant's] indemnity obligation" (Dkt. #21 at p. 11). The Report also notes that Plaintiff did not "identify any legal authority that would prevent an insurer from imposing a retention amount to be paid by the insured before covering costs related to its duty to defend, as [Defendant] has done here" (Dkt. #21 at p. 11). Aside from repeating broad notions that insurance contracts should be read in favor of coverage and against the insurer, Plaintiff has not provided the Court with any reason to disagree with the Magistrate Judge (*See* Dkt. #23).

Plaintiff's concession before the Magistrate Judge drives home the point. Below, Plaintiff asserted that "the **Regulatory Claim** retention *only* applies to the defined term '**Loss**,'" and that "if [Defendant's defense payments would qualify as '**Loss**,' . . . such payments *would* be subject to retention (Dkt. #16 at p. 19) (emphasis in original). The Magistrate Judge agreed and explained that "because '**Loss**' unambiguously includes defense expenses for regulatory claims, that coverage is also subject to the retention amount" (Dkt. #21 at p. 11). Plaintiff did nothing to limit or otherwise explain that concession in support of an opposite conclusion in its Objections (*See* Dkt. #23). Once more, the Report's logic was sound when it was issued. It is equally sound today. Perceiving no error and having conducted a *de novo* review on this point, the Court adopts this Section of the Report as well.

In summary, under the Policy's plain terms, **Loss** includes **Defense Expenses** for **Regulatory Claims**, and those **Defense Expenses** are subject to a $250,000 retention. Thus, Plaintiff is not entitled to judgment on the pleadings, and its Motion for that relief should be denied, as the Report concludes (Dkt. #21 at p. 14). Having determined these key issues, the Court now turns to the remaining dispute, which garnered objections by both parties.

### C.    Plaintiff and Defendants' Objections to the Report's Conclusion Regarding the Interaction of Defense Expenses and Defendant's Liability Limit

There is only one issue left for the Court to resolve. That is, whether **Defense Expenses** incurred in defending **Regulatory Claims** count against Defendant's total liability limit (i.e., "erode" Plaintiff's total amount of coverage). The Magistrate Judge concluded that the relevant language that forms the basis of this dispute is "unintelligible" (Dkt. #21 at p. 13). Accordingly, the Report concluded that it was not possible to answer, as a matter of law, this question on the pleadings (Dkt. #21 at pp. 11–13). But the Report does not indicate what should happen next in the

litigation stream (*See* Dkt. #21 at pp. 11–13). Both parties object to this conclusion (Dkt. #22; Dkt. #23). The Court addresses each parties' objections in turn. But before doing so, the Court returns to the Report's analysis on this question.

The relevant language here comes from the Texas – Regulatory Coverage Endorsement. The provision states that:

> The **Insurer**'s maximum aggregate Limit of Liability for **Loss** under this policy in connection with **Regulatory Claims** made against all **Insured's** shall be $250,000. This sublimit shall be part of and not in addition to the amount set forth in Item 2.A of the Directors and Officers Liability Declarations Page.

(Dkt. #21 at p. 11) (citing Dkt. #14-1 at p. 53). The Magistrate Judge detected an "apparent error" in this language, which neither party explained—or advanced an argument about—below (Dkt. #21 at p. 11). That is, the (ostensibly) errant apostrophe in the word "**Insured's**" (Dkt. #14-1 at p. 53). The Report was right, as a matter of fidelity to the Policy's text, to note that "[b]ecause the parties ask the court to resolve whether defense expenses for regulatory claims, which fall within the definition of '**Loss**,' are subject to the $250,000 limit of liability, the language of the liability limit matters" (Dkt. #21 at p. 11).

In discerning the meaning of the language of the liability limit, the Magistrate Judge explained that "there are at least two possible explanations for the apparent error in that language" (Dkt. 21 at p. 11). The Report continued:

> One possibility is that the apostrophe was included by mistake, and the drafters meant the provision to apply to "**Regulatory Claims** made against all **Insureds**." But a claim made against "all **Insureds**" rather than, say, "any **Insured**," would be one made against *all* members of that category, which includes "any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**," and possibly others (citing Dkt. #14-1 at p. 44) (defining "**Insured**" and "**Insured Person**"). Such an intention seems unlikely.

22

Another possibility is that a word was omitted, such that the drafters meant the provision to read something like "**Regulatory Claims** made against all **Insured's** agents." That reading would create new problems. The definition of "**Insured**" covers an unknowable number of people. So *which* insured's agents must be the target of a regulatory claim to trigger the limit? The provision does not say. And, of course, the court will not guess at what word—whether "agents" or something else—was omitted when the parties have left their intent unclear. *See Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 356 (Ind. Ct. App. 1995) (explain that courts are not free to alter the language of a contract).

(Dkt. #21 at p. 11). The Report concluded that, though each possible interpretation changes the applicability of the liability limit, it does not follow that the provision is ambiguous because "the language does not make sense" (Dkt. #21 at p. 12). The Report explained that "it can alter or amend the policy language only if there is a mutual mistake . . . or one party has acted fraudulently or inequitably based on the other party's mistake" (Dkt. #21 at p. 12) (internal citation omitted).

Because neither party suggested the applicability of either doctrine, the Magistrate Judge returned to the principle that "'the court must utilize other means to determine intent'" when the intentions of the parties are unclear due to an apparent error in the Policy language (Dkt. #21 at p. 13) (quoting *Plumlee*, 655 N.E.2d at 355). But the Magistrate Judge noted that consideration of extrinsic evidence is only permissible where there is an ambiguity to be cured (Dkt. #21 at p. 13) (citing *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 535 (Ind. 2006)). Because the Magistrate Judge found the language unintelligible (rather than ambiguous), the Report does not consider extrinsic evidence (Dkt. #21 at p. 13).

But the Magistrate Judge did address the Policy's cover page, which Defendant clung to below in support of its position that **Defense Expenses** count against the liability limit (Dkt. #21 at p. 13). As relevant here, the cover page states that: "'THE LIMIT OF LIABILITY AVAILABLE TO PAY **LOSS** SHALL BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE EXPENSES'" (Dkt. #21 at p. 13) (quoting Dkt. #14-1 at p. 1).

Plaintiff countered that the "cover page language is not part of the policy" (Dkt. #21 at p. 13) (citing Dkt. #16 at p. 18). Ultimately, however, this did not play a factor in the Report's conclusion.

The Report does not determine what to do with the cover page language because, in the Magistrate Judge's view, "the language does not answer the question at hand" (Dkt. #21 at p. 13). The Report states that the cover-page language "refers to 'the' limit of liability, but the policy includes many limits of liability . . . ." (Dkt. #21 at p. 13). Thus, per the Report, "the cover-page language, assuming it is part of the policy, does not conclusively place defense expenses for regulatory claims with the regulatory Endorsement's $250,000 liability limit" (Dkt. #21 at p. 13).

Picking up where the Magistrate Judge left off, only now does Plaintiff argue that the provision is unintelligible (Dkt. #23 at p. 7). Therefore, according to Plaintiff, instead of looking to other evidence to interpret the Policy language, the Court should simply hold that the provision is unenforceable (Dkt. #23 at p. 7). Plaintiff submits that Indiana law compels this conclusion because "'[a]lthough insurers are free to limit coverage to the extent the limitations are consistent with public policy, the exclusionary clause must clearly and unmistakably bring within its scope the particular act or omission that will bring the exclusion into play'" (Dkt. #23 at p. 7) (quoting *Everett Cash Mut. Ins. Co. v. Taylor*, 926 N.E.2d 1008, 1012 (Ind. 2010)). Because the Report found the language unintelligible, Plaintiff contends that the "exclusionary clause" cannot be interpreted to erode the liability limit (Dkt. #23 at p. 7).

For its part, Defendant raises a similar objection, though it seeks an alternative result. To be clear, Defendant only objects to the Report insofar as it recommends that the Court "'conclude that [Defendant] is not entitled to a declaration regarding whether . . . **Defense Expenses** count toward the $250,000 liability limit'" (Dkt. #22 at p. 2) (quoting Dkt. #21 at pp. 13–14). As

demonstrated above, the Magistrate Judge explored two plausible explanations for the apparent scrivener's error in the Policy language: (1) that it was simply a typographical error and "**Insured's**" ought to be read as "**Insureds**"; or (2) that it signaled an omitted word to follow "**Insured's**" (*See* Dkt. #21 at p. 13). Defendant suggests that the Magistrate Judge erred in determining that the language is "unintelligible" because, according to Defendant, one of the above interpretations makes perfect sense and accords with Indiana law, while the other does neither (*See* Dkt. #22 at pp. 4–5). To Defendant, only the first reading—that "**Insured's**" should be read as "**Insureds**"—makes sense as a matter of text and law (Dkt. #22 at pp. 5–6).

Defendant's argument in support of its objection comes in two waves. First, Defendant attempts to explain why the Report's second conception of the Policy language—that the apostrophe was intentional, and "**Insured's**" should be read to imply the existence of an additional, omitted word—is not viable (Dkt. #22 at pp. 5–6). Second, Defendants claim that the apostrophe that causes the consternation here was simply errant, and the clear intent behind the Policy was that "**Insured's**" should really be read as "**Insureds**" (Dkt. #22 at pp. 6–7). The Court will unpack each in turn.

As to its first Argument, Defendant asserts that a reading of the Policy language that assumes the apostrophe was intentional would be improper because, to make sense of it, the Court would have to wield a blue pencil and supply a filler word (*See* Dkt. #22 at p. 5). That is, the Court would have to fill in the blank in the sentence: "The **Insurer**'s maximum aggregate Limit of Liability for **Loss** under this policy in connection with **Regulatory Claims** made against all **Insured's** [_____] shall be $250,000" (*See* Dkt. #22 at p. 5; Dkt. #14-1 at p. 53). Defendant contends that the Court, should it exercise its imagination to complete that "Mad Lib," would

violate fundamental tenants of Indiana contract construction (*See* Dkt. #22 at p. 5) (citing *White v. W. Diversfield Ins. Co.*, 524 N.E.2d 1304, 1305 (Ind. Ct. App. 1988)). Further, Defendant notes that, because Indiana law requires courts to interpret insurance policies as a whole (rather than as individual phrases), that interpretation also lacks merit (Dkt. #22 at p. 5). Defendant offers an example of why, claiming that here, "acceptance of a construction that makes the word '**Insured's** possessive would require the Court to ignore the existing word 'all' that precedes '**Insured's**,' which would instead signal that a plural noun is to follow" (Dkt. #22 at p. 5). According to Defendant, because this construction violates Indiana's principles of contract construction, it must be rejected as unreasonable (Dkt. #22 at p. 5).

Building on this argument, Defendant next argues that the Magistrate Judge's first possible explanation for the errant apostrophe—that it was simply a scrivener's error—is right, and that it should accordingly be ignored (Dkt. #22 at p. 6). Thus, Defendant asks the Court to interpret the provision to say: "The **Insurer**'s maximum aggregate Limit of Liability for **Loss** under this policy in connection with **Regulatory Claims** made against all **Insureds** shall be $250,000" (*See* Dkt. #22 at p. 6; Dkt. #14-1 at p. 53). Defendant asserts that this construction is right for two reasons. First, it would not "require the Court to insert hypothetical words or to ignore existing words, and, therefore [would] not violate Indiana construction rules" (Dkt. #22 at p. 6). Second, it would align with other courts' refusal to invalidate a contract provision based on typographical errors (Dkt. #22 at p. 6). Defendant cites numerous cases in support of this approach, one of which hales from Indiana, and many of which are only persuasive authority from other jurisdictions (*See* Dkt. #22 at pp. 6–7). As the final arrow in its quiver—and a sharp one at that—Defendant notes that, originally, Plaintiff "apparently recognized the insignificance of the misplaced apostrophe here, as it used

'[sic]' after '**Insured's**' and did not make any arguments based on the apostrophe" before the Magistrate Judge (Dkt. #22 at p. 7). This in mind, Defendant reasserts that **Defense Expenses** must be subject to the $250,000 liability limit (Dkt. #22 at pp. 7–8).

The Court is drawn toward the logic of Defendant's arguments. But the Court agrees with the Magistrate Judge that the record does not contain sufficient evidence to conclusively establish the correct interpretation of the provision under Indiana law. The Report concludes that the relevant language is unintelligible and therefore cannot be uncoded decisively at the judgment on the pleadings stage (Dkt. #21 at pp. 11–13). Both of the Report's potential readings of the Policy language are, at least, theoretically feasible. But both leave unanswered questions that might lead one to question whether any sense can be made of the Policy language at all. As explained below, ultimately, the Court has three options: it can (1) agree with the Magistrate Judge that the language is unintelligible; (2) disagree with the Magistrate Judge and conclude that the language is intelligible, but ambiguous; or (3) disagree with the Magistrate Judge and conclude that the language is unambiguous. Each of these options presumes that the Court has enough information before it to reach a finite conclusion that bears allegiance to the text of the Policy and thereby gives effect to the parties' agreement. For the reasons that follow, today, the Court cannot determine how to interpret the Policy language on the record before it. This is because, though the parties did not raise the issue of the (apparent) error in the Policy language in their cross motions for judgment on the pleadings (*See* Dkt. #14; Dkt. #15), the Report has identified a textual issue that complicates the Court's interpretative task (Dkt. #21 at p. 11). Yet the parties have not fully briefed that issue. Further consideration and argument by the parties is, therefore, warranted. To demonstrate that

reaching a conclusion today would not reach a fair, satisfactory result, the Court addresses each option in turn.

Once more, the relevant language here is: "The **Insurer**'s maximum aggregate Limit of Liability for **Loss** under this policy in connection with **Regulatory Claims** made against all **Insured's** shall be $250,000" (*See* Dkt. #14-1 at p. 53). Under Indiana law, "[a]n insurance policy is ambiguous if a provision is susceptible to more than one reasonable interpretation." *Wagner v. Yates*, 912 N.E.2d 805, 810 (Ind. 2009); *Everett*, 926 N.E.2d at 1012 (Ind. 2010); *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997); *G&G Oil Co.*, 165 N.E.3d at 87 (quoting *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 578 (Ind. 2013)).

The narrow question is: what does "**Insured's**" mean? Certainly, the provision is not *cleanly* unambiguous. It would be if there were no typographical error. Alas, one exists. But that error is enough to make the Court hesitate. Even if the Court construed the apostrophe as no more than a typographical error, the Court would have to read out the apostrophe and presume that the parties did not otherwise intend it to be included. At this stage, the Court cannot confidently take that step, given that the parties did not even raise the issue in their respective Motions for Judgment on the Pleadings below (*See* Dkt. #14; Dkt. #15). Because the Magistrate Judge and the Court have legitimate questions regarding the construction of the Policy, which is subject to at least some interpretation, the Court cannot conclude today that the apostrophe was merely an error that should be read out, even though Plaintiff tacitly did so in its Motion (*See* Dkt. #16 at p. 17). Though that conclusion appears a likely result at this stage, fulsome briefing on Indiana law's treatment of typographical errors and even the potential applicability of the absurdity doctrine would be instructive. *See Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 307 F. Supp. 3d 907, 918 (S.D. Ind.

2018) (quoting *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 664 (7th Cir. 2010) ("'We will not bend the language of a contract to create an ambiguity where none exists, but neither will we follow a literal interpretation when to do so would lead to an unreasonable or absurd result.'")). Since the parties have not had a chance to fully brief the issue, further consideration is warranted.

Indeed, commonsensically, it appears that the apostrophe was simply a typographical error and should hold no interpretive weight. Indiana law encourages contracts to be interpreted in a commonsense manner. *Rieth-Riley Const. Co., Inc. v. Auto-Owners Mut. Ins. Co.*, 408 N.E.2d 640, 645 (Ind. Ct. App. 1980) ("In construing a contract, we must adopt the construction which appears to be appears to be in accord with justice, common sense, and the probable intention of the parties in light of honest and fair dealing."); *Mun. City of S. Bend v. Blue Lines*, 38 N.E.2d 573, 575 (Ind. 1942) ("A contract will, if possible, be construed so as to render it reasonable rather than unreasonable.").

Further, as Defendant points out, other courts have declined to render contract language ambiguous simply because of a punctuation error. *See, e.g.*, *White Truck Sales of Indianapolis, Inc. v. Shelby Nat. Bank of Shelbyville*, 420 N.E.2d 1266, 1269 (Ind. Ct. App. 1981) ("A clerical error will not defeat the otherwise clear contract."); *Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 894 (N.D. Ill. 2009), *aff'd*, 615 F.3d 808 (7th Cir. 2010) ("The contract law doctrine of 'scrivener's error,' or mutual mistake, allows a court of equity to reform a contract where a written agreement does not reflect the clear intent of the parties due to a drafting error."); *Hall v. Rag-O-Rama, LLC,* No. 20-6059, 2021 WL 5782381, at *4 (6th Cir. Dec. 7, 2021) ("[G]rammar errors do not automatically render a contract ambiguous if it has a clear meaning despite those errors."); *Payless Shoesource, Inc. v. Travelers Cos., Inc.*, 585 F.3d 1366, 1368 (10th Cir.

2009) ("[W]hile misplaced modifiers are syntactical sins righteously condemned by English teachers everywhere, our job is not to critique the parties' grammar, but only, if possible, to adduce and enforce their contract's meaning. Here, a punctuation peccadillo notwithstanding, the meaning of the parties' contract is unambiguous."); *Baez v. New York City Hous. Auth.*, 533 F. Supp. 3d 135, 146 (S.D.N.Y. 2021) (referring to a contract and noting that "the inclusion of an apostrophe 's' appears to be the product of a scrivener's error") (citing *Banco Espírito Santo, S.A. v. Concessionária De Rodoanel Oeste S.A.*, 100 A.D. 3d 100, 109 (N.Y. App. Div. 2012) ("It is a cardinal principle of contract interpretation that mistakes in grammar, spelling or punctuation should not be permitted to alter, contravene or vitiate manifest intention of the parties as gathered from the language employed."). Indiana has also recognized the (sometimes) trivial nature of typographical errors in matters of interpretation, though not in the context of interpreting a provision of a contract. *See, e.g.*, *Schiller v. Knigge*, 575 N.E.2d 704, 707 (Ind. Ct. App. 1991) ("A misplaced apostrophe is not such a rare occurrence that it will be given significant weight in determining the intent of the trial court.").

More saliently here, Defendant has even noted that some district courts, when faced with an insurance policy that stated "Insured's" instead of "Insureds," simply worked around the typographical error by marking the errant apostrophe "s" with a "[sic]" (*See* Dkt. #22 at p. 7) (citing *Roadrunner Transp. Servs., Inc. v. Bob White Express, Inc.*, No. 5:17-CV-457-JKP, 2020 WL 4188609, at *3 (W.D. Tex. July 21, 2020); *Certain Underwriters at Lloyd's London Subscribing to Certificate No. Z178324-004APD v. Deol Transp., Inc.*, No. 118CV1383LMBJFA, 2019 WL 5459057, at *2 (E.D. Va. Oct. 24, 2019)). But the meaning (or lack thereof) tied to the apostrophe was not at issue in those cases.

Though it was not originally the subject of any dispute, after the Magistrate Judge highlighted the apparent error, the apostrophe is the cause of controversy. Plaintiff does not grapple with this caselaw or indicate its intention at the time of formation (*See* Dkt. #23 at p. 7). But it now contends that the apostrophe renders the provision unintelligible (*See* Dkt. #23 at p. 7). Thus, the Court hesitates to ignore the apostrophe today. If Plaintiff conceded that it was merely a typographical error, then the inquiry before the Court would be far simpler. No less, the parties have yet to locate any Indiana authority that would permit the Court, sitting in diversity, to make an *Erie* guess and ignore the errant apostrophe.

On the other hand, if "**Insured's**" is not unambiguous, then the Court must resolve an ambiguity. In attempting to interpret the word "Insured's," the Report posits two reasonable interpretations. In the context of the entire Policy, the sentence does not make sense as written; it is "unintelligible" (*See* Dkt. #21 at p. 13). One interpretation is that the apostrophe "s" should be followed by a word that is omitted in the provision, as written. Defendant contends that this interpretation is unreasonable because it invites the Court to add words to the Policy, which violates Indiana law (*See* Dkt. #22 at p. 5) (citing *Western Diversifeld Ins. Co.*, 524 N.E.2d at 1305). But Defendant's position skips a step. The ambiguity inquiry is whether the *text* yields two reasonable interpretations; it is not a consideration of what the Court must do next to resolve that ambiguity. *See Wagner*, 912 N.E.2d at 810. Thus, the first option the Report posits is reasonable. But it is also reasonable to think that the apostrophe is errant altogether and that the provision should say "insureds." Thus, at least some facial ambiguity exists. The Court cannot ignore it—at least not yet. *See id*.

At this point, the Court must answer a question that is, at best, half-baked. That is, which interpretation is *more* reasonable, or is there another reasonable construction not contemplated by the Magistrate Judge altogether? As to the second question, the parties have not suggested any other plausible interpretation (*See* Dkt. #22; Dkt. #23). Neither does the Court discern one. But one interpretation seems *more* reasonable than the other. That is the second option the Report explores—the one advanced by Defendants. The most reasonable construction of the Policy language would not seem to be that "[t]he **Insurer**'s maximum aggregate Limit of Liability for **Loss** under this policy in connection with **Regulatory Claims** made against all **Insured's** [INSERT WORD] shall be $250,000" (*See* Dkt. #14-1 at p. 53). This is because, as Defendant points out, Indiana law does not bestow upon the Court carte blanche to add words to contracts just to try to make sense of them (Dkt. #22 at p. 5). *See, e.g.*, *Jackson v. E&B Paving, LLC*, 231 N.E.3d 270, 277 (Ind. Ct. App. 2024), *transfer denied sub nom. Jackson v. E& B Paving, LLC*, 241 N.E.3d 1124 (Ind. 2024) ("It is a well-settled principle of contract interpretation that we do not add terms to a contract."); *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 756 (Ind. 2018) ("[W]e will not add tacit terms in the parties' express, agreed upon ones); *Zeller v. AAA Ins. Co.*, 40 N.E.3d 958, 962 (Ind. Ct. App. 2015) (quoting *Terre Haute First Nat'l Bank v. Pac. Empl. Ins. Co.*, 634 N.E.2d 1336, 1339 (Ind. Ct. App. 1993) ("'Insurance policies are contracts between private parties; we cannot rewrite the policy nor make a new or different policy, but must enforce the terms of the policy as agreed upon by the parties.'"). The number of words that could follow the word "**Insured's**" are infinite, and the Magistrate Judge was right to not entertain the guessing game that would ensue in trying to pick the "right" word to fill in the blank. Nothing else in the Insurance policy suggests a feasible word to follow "**Insured's**" either (*See generally* Dkt. #14-1).

At this preliminary stage, it appears more reasonable to read the Policy language without the apostrophe altogether. That is, the Policy should read: "[t]he **Insurer**'s maximum aggregate Limit of Liability for **Loss** under this policy in connection with **Regulatory Claims** made against all **Insureds** shall be $250,000" (*See* Dkt. #14-1 at p. 53) (apostrophe "s" in "**Insured's**" omitted). To date, Plaintiff does not appear to offer a response to suggest that this interpretation is *not* reasonable, and the Court today must perceive it as the most readily apparent, reasonable interpretation of the provision (*See* Dkt. #23). Instead, Plaintiff leans on the Report to argue that there is *no* reasonable interpretation of the provision, and it should therefore be either unenforceable or construed against the drafter (*See* Dkt. #23 at pp. 7–8). Further, Plaintiff offers no response to Defendant's admission that the apostrophe is "merely a punctuation mistake" (Dkt. #22). In fact, Plaintiff did not think the (ostensibly) errant apostrophe was problematic before the Magistrate Judge *sua sponte* noted the issue—Plaintiff marked "**Insured's**" with a "[sic]" originally, and advanced no argument related thereto (*See* Dkt. #16 at p. 17).

Ultimately though, use of extrinsic evidence is permissible in constructing ambiguous text. *See Univ. of S. Ind. Found.*, 843 N.E.2d at 535. If it is ambiguous, judgment on the pleadings is not a proper mechanism to facilitate that review. Further, in deciding how to interpret the language, as Plaintiff points out, the principle of *contra preferentum* applies under Indiana law. *See G&G Oil*, 165 N.E.3d at 87. That is, the Court must construe ambiguity against the drafter of an insurance policy. *See id.* It is premature to decide the ambiguity question today, when the parties have not fully briefed the issue as the apparent error was first explored by the Magistrate Judge, and the parties have not had an opportunity to submit parol evidence. Thus, assuming the provision is ambiguous, the Court does not have enough information before it to *fairly* make a decision now.

Finally, the Court hesitates to hold that the Policy language is unintelligible, because it would seem a potentially absurd result—at least on this record—to gut the liability limit provision because of what seems to be a typographical error. *See, e.g.*, *FLM, LLC v. Cincinnati Ins. Co.*, 27 N.E.3d 1141, 1143 (Ind. Ct. App. 2015) ("An exclusion in an insurance policy must clearly and unmistakably bring within its scope the particular act or omission that will give rise to the exclusion in order to be effective, and coverage will not be excluded or destroyed by an exclusion or condition unless such clarity exists.") (internal quotation omitted). That is certainly warranted sometimes under the law, but the Court will not take that drastic step before full briefing. It is possible to make sense of this provision. But the Court will not make a knee-jerk reaction simply to render a more expedient judgment at the judgment on the pleadings stage.

In summary, the Report raises a legitimate concern that the parties have not adequately briefed. Thus, in fairness, the Court believes that the parties should be allowed to supply that briefing. Accordingly, the Court returns the matter to the Magistrate Judge for further consideration after the parties have had the opportunity to submit full briefing on how to interpret the Policy provision and whether, given the apparent error in the provision, the Court should hold that it is unambiguous, ambiguous, or unintelligible.

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion for Judgment on the Pleadings (Dkt. #14) is **GRANTED in part** and **DENIED** in part. It is further **ORDERED** that Plaintiff's Motion for Judgment on the Pleadings (Dkt. #15) is **DENIED**. The court **ADOPTS** the conclusions the Magistrate Judge reached in parts I., II., III.A. and III.B. of the Report. It is finally

**ORDERED** that Section III.C. of the Report should be **RETURNED** to the Magistrate Judge

for further consideration after full briefing.

      **IT IS SO ORDERED.**

      **SIGNED this 17th day of April, 2025.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE